UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                             :

EMILY SMITH,                                :

                    Plaintiff,            :

                                             :

            -v-                      :          24 Civ. 2767 (JPC)

                                           :

JAMES LYLE and FULMAR ADVISORS LTD,   :       OPINION AND ORDER

                                           :

                  Defendants.       :

                                           :

------------------------------------------------------------------- X

JOHN P. CRONAN, United States District Judge:

      This civil action resulted from a falling out between James Lyle, founder of the investment firm Fulmar Advisors, Ltd. ("Fulmar"), and his former assistant, Emily Smith. Lyle and Fulmar maintain that the parties' relationship soured after Smith wrote herself three checks from Lyle's bank account, totaling $21,500, leading them to fire her soon thereafter. Smith, for her part, says that those payments were legitimate reimbursements for expenses that she advanced on Lyle and Fulmar's behalf. And according to Smith, Lyle and Fulmar are really the ones in the wrong—that is, for failing to pay her overtime, illegally docking her wages to recoup a purported salary advance, failing to provide certain wage-related information, and taking her personal belongings.

      Smith asserts statutory causes of action against Lyle and Fulmar under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") premised on Lyle and Fulmar's alleged wage-and-hour violations, as well as a common law claim for conversion. Lyle and Fulmar, meanwhile, bring counterclaims against Smith for conversion relating to the allegedly unauthorized checks, for breach of fiduciary duty, and for money had and received relating to excess amounts given to her as a purported salary advance.

Lyle and Fulmar now move for summary judgment under Federal Rule of Civil Procedure 56 on Smith's federal and state overtime claims, and move to dismiss her claim for unlawful deductions under Rule 12(b)(6).  Smith simultaneously moves to dismiss Lyle and Fulmar's counterclaim for money had and received.

For the reasons stated below, the Court denies both sides' motions.

## I.  Background

### A.    Factual Background

#### 1.  Smith's Employment with Lyle and Fulmar[1]

Lyle is the owner and founder of Fulmar, an investment management firm based in Lyford Cay, in the Bahamas.  Defts.' 56.1 Stmt. ¶ 1.  Smith began working for Lyle and Fulmar effective July 12, 2021, although the parties dispute whether her job title is best characterized as "personal assistant" or "executive assistant," and whether Smith performed a meaningful amount of work for Fulmar in that capacity.  *Id.* ¶ 2; Pl.'s 56.1 Stmt. ¶ 2.  Either way, the parties agree that Smith's starting annual salary was $65,000, which was later increased to $92,000 on August 2, 2022.  Defts.' 56.1 Stmt. ¶ 3.

In connection with Smith's hiring, Smith and Lyle executed an offer letter dated June 23, 2021.  *See* Sigda Decl., Exh. 2.  Foreshadowing the parties' disagreement regarding Smith's job

---

[1] The following facts are relied upon by the Court for purposes of Part II of this Opinion and Order, are considered in the light most favorable to Smith, and are taken from the parties' statements of undisputed material facts submitted pursuant to Local Civil Rule 56.1(a), Dkts. 28 ("Defts.' 56.1 Stmt."), 37 ("Pl.'s 56.1 Stmt."), 45 (Defendants' reply Rule 56.1 statement), as well as the declarations filed in support of and in opposition to Lyle and Fulmar's motion for summary judgment and the supporting exhibits attached to those declarations, Dkts. 29 ("Lyle Decl."), 30 ("Sigda Decl."), 39 ("Smith Decl."), 40 (declaration of Orin Kurtz), 44 ("Lyle Reply Decl."). Unless otherwise noted, the Court cites only to a party's Rule 56.1 Statement where the adverse party does not dispute the fact, has offered no admissible evidence to refute that fact, simply seeks to add its own "spin" on the fact, or otherwise disputes only the inferences that can be drawn from the stated fact.

title, the offer letter listed her contemplated position as "Executive/Personal Assistant." *Id.* The

offer letter also provided the following "Job Description":

- Support the Principal as a right hand "Gatekeeper" prioritizing, preparing and coordinating professional/personal calendar management
- Prioritize and follow-up on all correspondence[], both written and verbal with attorneys, accountants and high-[]end business associates as well as execute wire transfers
- Organize and manage domestic/international travel arrangements; coordinate complex itinerary details.  This also includes family vacation travel
- Interface with household manager to make sure all properties are maintained
- Handle complex expense reporting
- Assist with the preparation for business board meetings for the Principal
- Plan, coordinate and execute special events, dinners with key business contacts, personal and professional as well as orchestrate logistics for
- The role is remote for now and will move to partially remote from your home and the Principal's home office/flexible scheduling, some travel required.
- Additional ad hoc projects based on day to day needs of Principal
- Confidentiality and discretion in handling all matters a MUST

*Id.*

Smith also executed an employment agreement with Fulmar, which she dated June 28,

2021.  Sigda Decl., Exh. 3.  The employment agreement, like the offer letter, designated Smith's

job title as "Executive/Personal Assistant," and provided the following list of "Responsibilities":

- Support the Principal as a right hand "Gatekeeper" prioritizing, preparing, and coordinating professional/personal calendar management
- Prioritize and follow-up on all correspondence, both written and verbal with attorneys, accountants and high-[]end business associates as well as execute wire transfers
- Organize and manage domestic/international travel arrangements; coordinate complex itinerary details.  This also includes family vacation travel
- Interface with household manager to make sure all properties are maintained
- Handle complex expense reporting
- Assist with the preparation for business board meetings for the Principal
- Plan, coordinate and execute special events, dinners with key business contracts, personal and professional as well as orchestrate logistics for
- Hours 9AM-6PM, Monday-Friday with off hour availability via cell
- The role is remote for now and will move to partially remote from your home and the Principal's home office/flexible scheduling
- Confidentiality and discretion in handling all matters a MUST

*Id.* at 1-2.  The employment agreement listed Lyle as the "Principal."  *Id.* at 5.  The employment agreement further specified:

> [Smith] shall not have the right to act in the capacity of [Fulmar].  This includes, but is not limited to, making written or verbal agreements with any customer, client, affiliate, vendor, or third (3rd) party.  These rights may or may not change at any time in the future by [Fulmar].

*Id.* at 3.

The parties dispute the extent to which Smith's offer letter and employment agreement accurately reflected the nature of her work.

According to Lyle, "Smith performed all of the duties set forth in her job description." Lyle Decl. ¶ 6; *see also* Lyle Reply Decl. ¶ 3 ("Smith did perform certain non-exempt tasks in her position, but [Smith]'s primary tasks consisted of the tasks set forth in her job description.").  Lyle explains that, in addition to the duties in her job description, "Smith often made decisions on her own or recommended action to be taken, which was finalized by [Lyle]."  Lyle Decl. ¶ 6.  For example, Lyle claims that Smith "worked on special projects such as identifying the need for, and coordinating the implementation of, a new IT system."  *Id.* ¶ 6.  Lyle also asserts that "Smith was provided with the authority and judgment to make payments as appropriate" and "could bind [Fulmar] financially."  *Id.* ¶ 7.  And according to Lyle, "Smith performed this function throughout her employment."  *Id.*

In support of his contention that Smith exercised financial authority, Lyle notes that "[b]ecause [he] was often away from New York, [he] would pre-sign blank checks and give them to [Smith] for her to make the payments necessary for the running of the business."  *Id.* ¶ 8.  Lyle further claims that "[i]n or about June 2023, [he and Fulmar] learned that between May 25 and June 20, 2023, [Smith] wrote three checks to herself from Mr. Lyle's bank account totaling $21,500."  *Id.*  Lyle states that "the three checks that [Smith] issued to herself were signed in

advance by [him]," and that he "had no knowledge of their issuance" until after the checks were "brought to [his] attention by the firm that performed accounting services for [him]." *Id.* Those checks were each signed by Lyle and were made out on his behalf from his Fieldpoint Private checking account. *See* Sigda Decl., Exh. 4.

Smith paints a different picture of her role. She describes her "primary duty" as "keeping [Lyle]'s calendar and life organized," Smith Decl. ¶ 3, and maintains that she "did little to no work" for Fulmar itself, *id.* ¶ 7. Smith asserts that she "did not ever enter into an agreement on [Lyle or Fulmar's] behalf" and that "[a]ny time [Lyle] entered into an agreement for services or [made] a purchase, [she] did nothing more than gather options for him to choose from." *Id.* ¶¶ 4-5. By way of example, Smith states that when Lyle "decided that he wanted to move several art works from his New York apartment to his house in Maine," she "found several moving companies, obtained quotes, and presented those quotes to Mr. Lyle who chose what company to use." *Id.* ¶ 5. But, Smith asserts, Lyle "signed all of the contracts for the shipping of the artwork." *Id.* ¶ 6.

Consistent with such responsibilities, Smith describes her role as Lyle's "personal assistant." *Id.* ¶ 7. To that end, Smith contends, her true job responsibilities chiefly included tasks such as

> dog sitting, house sitting at [Lyle's] house in Maine, house sitting at his apartment in New York City, helping care for [Lyle's] children, and various nondiscretionary administrative tasks such as organizing [Lyle's] email, paying his bills, [adding] meetings and lunches to [Lyle's] calendar at his direction, arranging for maintenance on Lyle's house at [Lyle's] direction, and making dinner and travel reservations.

*Id.* ¶ 8. Smith also notes that she flew to the Bahamas on Lyle's rented jet on two occasions: first, to "pack[] up [Lyle's] belongings at his house/office," and second, to take "[Lyle's] dogs on the private jet so the dogs would be at the Bahamas house when [Lyle] arrived there." *Id.* ¶ 9. Smith

explains that she "did not independently decide to go to the Bahamas," but instead "went at [Lyle's] direction and performed tasks as directed by [Lyle]." *Id.* ¶ 10.

Smith also contends that she "did not perform many of the tasks that are listed in [her] offer letter and employment agreement." *Id.* ¶ 11. For instance, while Smith's formal job description stated that she would serve as Lyle's "gatekeeper," she claims that in fact she "did not preside over, screen, or control [Lyle's] communications" at all. *Id.* Smith also contends that whereas her job description stated that she would manage correspondence with Lyle's attorneys, accountants, and business associates, in reality she merely "conveyed" their messages to Lyle and "did not engage in substantive conversations" with them. *Id.* ¶ 13. Further, Smith asserts that, contrary to her formal job description, she neither assisted with preparation for board meetings nor planned, coordinated, or executed "special events." *Id.* ¶ 14. According to Smith, the closest things she did to these tasks were entering meetings on Lyle's calendar at his direction, printing out documents for meetings, coordinating parties for Lyle's children, and making dinner reservations for Lyle. *Id.* And when making reservations, Smith says that her role was limited to presenting Lyle with various options for restaurants, whereas he would make the final decision in terms of location and time. *Id.*

Smith also disputes Lyle's assertion that she was responsible for coordinating the implementation of a new IT system, or that installing that system was her idea. *Id.* ¶ 15; *see* Lyle Decl. ¶ 6. Instead, as Smith tells it, "[w]hen [Lyle] sold his house in the Bahamas he decided that he would prefer to have a US-based IT company rather than one based in the Bahamas." Smith Decl. ¶ 15. Her role was to "research[] the options and provide[] [Lyle] with several price quotes from IT companies," after which Lyle "chose which IT company he wanted to work with and directed [her] to implement the choice." *Id.* Smith then "contacted an IT professional who came

to [Lyle's] apartment and set up his system." *Id.* Smith maintains that she "did not have the authority to choose the IT company or the computer programs and followed [Lyle's] direction." *Id.*

Smith also challenges Lyle's characterization of her financial authority. She admits that Lyle signed blank checks for her to use, but asserts that the checks were only "to pay his invoices and bills." *Id.* ¶ 17; *see* Lyle Decl. ¶ 8. Smith contends that she "spent very little time—thirty minutes or less in any given week—writing checks" on Lyle's behalf. Smith Decl. ¶ 17.

In response, Lyle challenges certain aspects of Smith's description of her role. According to Lyle, one of Smith's "primary dut[ies] was to pay invoices and bills" and she used the pre-signed checks "to make the payments necessary for the running of the business," an aspect of her role that "could consume substantial time." Lyle Reply Decl. ¶ 6. Lyle also contends that in writing these checks, Smith would "interact[] with the vendor or organization about the items in the invoice or services performed." *Id.*

Lyle also notes that he "engaged other individuals to be dog walkers" and "engaged other individuals who cared for [his] children," though it is unclear whether he disputes that Smith also performed these tasks. *Id.* ¶ 4. Regarding Smith's two trips to the Bahamas, Lyle asserts that while on these trips Smith "performed work in accordance with her job description," such as "packing up [his] office," and that "the purpose of the [second] trip was for business purposes." *Id.* ¶ 5. Lyle reiterates that Smith's "primary tasks consisted of the tasks set forth in her job description," but concedes that she "did perform certain non-exempt tasks in her position" as well. *Id.* ¶ 3.

Smith's employment ended in June 2023, shortly after Lyle and Fulmar discovered that she had written the three checks to herself from Lyle's bank account, in the total amount of $21,500.

Smith Decl. ¶ 16; Lyle Decl. ¶ 8. Lyle became aware of those withdrawals after his contact at Fieldpoint Private flagged the checks as "suspicious" because Smith "did not normally receive funds via [that] account and rarely in such large lump sums." Sigda Decl., Exh. 5; *see* Lyle Decl. ¶ 8. Smith maintains that she wrote those checks to reimburse herself for legitimate expenses that she advanced on Lyle and Fulmar's behalf. Smith Decl. ¶ 16. Nevertheless, Lyle and Fulmar terminated Smith's employment soon after confronting her about the checks. *Id.*; Lyle Decl. ¶ 11.

### 2. Lyle and Fulmar's Alleged Wage Deductions[2]

Smith alleges that she worked for Lyle and Fulmar from June 2021 through June 2023. Am Compl. ¶ 4. In the beginning of 2023, Lyle and Fulmar gave Smith a "purported salary advance" that "was made in two installments." *Id.* ¶ 26. First, on January 19, 2023, Smith was paid $24,791.69, which was equivalent to seven biweekly pay periods. *Id.* Second, on April 11, 2023, Smith was paid $28,333.36, the equivalent of eight biweekly pay periods. *Id.* Smith alleges that the total amount of the alleged salary advance was $54,125.05, leaving unexplained the apparent $1,000 discrepancy. *Id.* ¶ 27.

Smith alleges that of that amount, Lyle and Fulmar recouped approximately $42,994.09 by deducting amounts from her regular wages. *Id.* In doing so, however, Lyle and Fulmar allegedly failed to "agree to the timing and duration of the repayment deduction with [Smith], in writing, before the purported advance was given." *Id.* ¶¶ 31-32. Lyle and Fulmar also allegedly "did not obtain a written authorization from [Smith] for the deduction to be made." *Id.* ¶¶ 33-34. And finally, Smith contends that Lyle and Fulmar "did not implement a procedure for [Smith] to dispute

---

[2] The following facts, which are assumed true for purposes of Part III of this Opinion and Order, are taken from Smith's Amended Complaint, Dkt. 25 ("Am. Compl."). *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

the amount and frequency of deductions." *Id.* ¶¶ 35-36. Smith contends that in each of these ways, Lyle and Fulmar violated the NYLL's implementing regulations applicable to salary advances, rendering the alleged deductions unlawful.

### 3. Smith's Allegedly Inequitable Retention of the Salary Advance[3]

Lyle and Fulmar allege that Smith was employed by Fulmar. Counterclaims ¶ 5. In the beginning of 2023, Smith requested payment in advance, to which Fulmar agreed. *Id.* ¶ 23. On January 19, 2023, Smith was paid $24,791.69 in advance, representing seven biweekly pay periods. *Id.* Then, on April 11, 2023, Smith was paid $28,333.36, equal to eight biweekly pay periods. *Id.*

Lyle and Fulmar allege that although Smith was paid in advance for fifteen biweekly pay periods, she did not work the full duration of those pay periods because her employment ended on June 27, 2023. *Id.* ¶ 24. Smith was therefore allegedly overpaid $11,130.96. *Id.* Lyle and Fulmar allege that "[n]o part of this amount has been paid though demand for payment in full has been made." *Id.* ¶ 25.

### B. Procedural History

Smith initiated this action against Lyle and Fulmar on April 11, 2024. Dkt. 1. Through an Amended Complaint filed on November 18, 2024, Smith asserts the following causes of action: failure to pay overtime under the FLSA and the NYLL (Counts I and II, respectively), Am. Compl. ¶¶ 44-57; failure to provide a compliant initial pay notification under the NYLL (Count III), *id.* ¶¶ 58-61; failure to provide accurate statements of the regular and overtime hours worked under

---

[3] The following facts, which are assumed true for purposes of Part IV of this Opinion and Order, are taken from Lyle and Fulmar's Counterclaims to Smith's Amended Complaint, Dkt. 31 ("Counterclaims"). *See Interpharm*, 655 F.3d at 141.

the NYLL (Count IV), *id.* ¶¶ 62-65; conversion (Count V), *id.* ¶¶ 66-69; and unlawful wage deductions under the NYLL (Count VI), *id.* ¶¶ 70-73.

Lyle and Fulmar answered the Amended Complaint on December 17, 2024, denying liability under each of Smith's causes of action and asserting three counterclaims against her. Dkt. 31. Those counterclaims were for conversion based on the checks that Smith allegedly wrote to herself from Lyle's bank account (First Cause of Action), Counterclaims ¶¶ 8-15; breach of fiduciary duty arising out of that same conduct (Second Cause of Action), *id.* ¶¶ 15-21; and money had and received, based on the alleged $11,130.96 overpayment that resulted from Smith's employment concluding prior to the end of the fifteen pay periods for which she received a salary advance (Third Cause of Action), *id.* ¶¶ 22-25.

On December 10, 2024, Lyle and Fulmar moved for summary judgment on Counts I and II of the Amended Complaint and for dismissal of Count VI for failure to state a claim. Dkts. 26, 27 ("Defts.' Motion"), 28-30. Smith opposed that motion on January 9, 2025. Dkts. 37 ("Pl.'s Opposition"), 38-40. Lyle and Fulmar then replied in support of their motion on January 23, 2025. Dkts. 43 ("Defts.' Reply"), 44-45.

On January 9, 2025, Smith moved to dismiss Lyle and Fulmar's Third Cause of Action, for money had and received, for failure to state a claim under Rule 12(b)(6). Dkts. 35, 36 ("Pl.'s Motion"). Lyle and Fulmar opposed that motion on February 6, 2025, Dkt. 46 ("Defts.' Opposition"), and Smith filed a reply in support of her motion on February 13, 2025, Dkt. 47 ("Pl.'s Reply").

## II. Lyle and Fulmar's Motion for Summary Judgment

Lyle and Fulmar seek summary judgment on Smith's causes of action for failure to pay overtime under the FLSA and the NYLL. Defts.' Motion at 1. They do so on the ground that

Smith, as a purported "executive assistant" to Lyle, performed work that renders her ineligible for overtime compensation under the FLSA's and the NYLL's administrative exemption. *Id.* But for the following reasons, the Court concludes that the record discloses genuine disputes of material fact concerning the nature of Smith's role, precluding summary judgment based on the administrative exemption. Accordingly, the Court denies Lyle and Fulmar's motion for summary judgment.

### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008). The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant "to present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted). The non-movant must present more than a mere "scintilla of evidence." *Anderson,* 477 U.S. at 252.

**B.** **Statutory and Regulatory Framework**

The FLSA and the NYLL generally require employers to pay their employees time-and-a-half for hours worked above forty in a single week. *See* 29 U.S.C. § 207(a)(1); 12 N.Y.C.R.R. § 142-2.2. The requirement to pay overtime, however, is subject to various exemptions, including (as relevant here) an exemption for employees who serve "in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1); N.Y. Lab. Law § 651. As an affirmative defense to liability under the FLSA and the NYLL, the employer bears the burden of proving that the administrative exemption applies to a particular employee. *Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir. 2011) ("The employer who invokes the exemption bears the burden of establishing that the employee falls within the exemption."). And whether that exemption applies in a given case is a "mixed question of law and fact." *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014) ("The question of how the employees spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." (internal quotation marks omitted)). Because the FLSA's and NYLL's administrative exemptions are, for the most part, identical, the Court (like the parties) focuses its analysis on the FLSA. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012).

The Department of Labor has promulgated regulations that add definition to the FLSA's administrative exemption, and the parties agree that those regulations control in this case. To begin, the applicable regulations limit the administrative exemption to

> any employee: (1) Compensated on a salary or fee basis at not less than [$684 per week (as of the time period relevant to this case)]; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a); *see id.* § 541.600(a) (2021).  As noted, Lyle and Fulmar bear the burden of proving that each of these elements is satisfied.  *See Ramos*, 687 F.3d at 558.

The regulations provide additional detail regarding these elements.  As to the second requirement, the regulations explain that "[t]he phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee."  29 C.F.R. § 541.201(a).  Thus, to meet that requirement "an employee must perform work directly related to assisting with the running or servicing of the business."  *Id.*  The regulations provide the following nonexhaustive list of functions that are considered to be "directly related to management or general business operations":

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* § 541.201(b).  The regulations also explain that "[a]n employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers."  *Id.* § 541.201(c).

The third element of the administrative exemption provides that the "employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."  *Id.* § 541.202(a).  As a general matter, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  *Id.*  And "[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed.'"  *Id.*

The regulations provide additional guidance concerning the level of discretion and independent judgment that an employee must exercise to fall within the exemption. At the very least, that requirement "implies that the employee has authority to make an independent choice, free from immediate direction or supervision." *Id.* § 541.202(c). An employee can still exercise discretion and independent judgment, however, "even if their decisions or recommendations are reviewed at a higher level." *Id.* Accordingly, the requirement of discretion and independent judgment "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.* Thus, "decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action," and "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*

The regulation directs courts to consider the following nonexhaustive list of factors in determining whether an employee exercises discretion and independent judgment:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

Under these standards, "[a]n executive assistant or administrative assistant to a business owner or senior executive of a large business generally meets the duties requirements for the administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance." *Id.* § 541.203(d).

## C.    Analysis

Smith does not dispute that she met the minimum salary thresholds necessary to qualify for the administrative exemption under both the FLSA and the NYLL at all relevant times. *See generally* Pl.'s Opposition. She does, however, deny that her primary duty related directly to the management or general business operations of her employers and that her primary duty included the exercise of discretion and independent judgment with respect to matters of significance. *Id.* at 12-18. For the following reasons, the Court holds that genuine disputes of material fact concerning both issues render summary judgment inappropriate on the present record.

### 1.    Work Directly Related to the Management and General Business Operations of the Employers

As discussed, the second element of the administrative exemption requires that the employee's "primary duty" was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a). Here, the parties present competing views as to whether Smith's role as Lyle's assistant was primarily of a personal or business-oriented nature.

Lyle and Fulmar characterize Smith's role as that of an executive assistant to a high-level business executive, precisely the sort of role that courts and the applicable FLSA regulations have recognized as falling within the administrative exemption. Defts.' Motion at 11-12; *see Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F. Supp. 2d 288, 301 (S.D.N.Y. 2005) (citing 29 C.F.R. § 541.201(a)(1)). To that end, they rely heavily on the formal job description contained in Smith's

offer letter and employment agreement, which state that her role would include tasks like gatekeeping Lyle's professional and personal communications; handling correspondence with attorneys, accountants, and business associates; assisting in preparation for board meetings; managing travel; and handling complex expense reporting. Sigda Decl., Exh. 3 at 1-2. These types of functions, Lyle and Fulmar argue, are the sorts of tasks that courts have found to qualify an employee for the administrative exemption.

An employee's title and formal job description, however, are not dispositive of the nature of the employee's primary duty for purposes of the administrative exemption. Instead, that inquiry demands an intensive factual assessment focused on "evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in . . . position descriptions." *Erdemir v. Allstate Marble & Granite, Kitchens & Baths Inc.*, 704 F. Supp. 3d 337, 365 (E.D.N.Y. 2023) (internal quotation marks omitted); *see Coker v. Goldberg & Assocs. P.C.*, No. 21 Civ. 1803 (ER), 2022 WL 874719, at *3 (S.D.N.Y. Mar. 24, 2022) (noting that "the exempt or nonexempt status of an employee cannot be assessed from the employee's title alone"). And to that end, the current record evidence concerning the nature of Smith's actual day-to-day work is both vague and fiercely contested.

Apart from Smith's offer letter and employment agreement, Lyle and Fulmar rely almost entirely on a short declaration submitted by Lyle that is woefully lacking in factual detail. In that declaration, Lyle broadly asserts that Smith "performed all of the duties set forth in her job description." Lyle Decl. ¶ 6. Yet the examples he provides are either so vague as to almost be meaningless or are contested by Smith's own declaration. For example, Lyle contends that Smith "often made decisions on her own or recommended action to be taken," *id.*, but provides no basis for any inference that these decisions related primarily to the management or general operation of

Lyle's business, as opposed to his personal life.  Lyle also states that Smith "worked on special projects such as identifying the need for, and coordinating the implementation of, a new IT system." *Id.*  But Lyle does not say anything about whether or how that IT system related to his or Fulmar's business operations or provide any indication that Smith's role in helping to set up that system was representative of her primary duty.  Lyle further suggests that Smith "could bind [Fulmar] financially," but again fails to provide any examples of Smith actually doing so beyond noting that he "would pre-sign blank checks and give them to [Smith] for her to make the payments necessary for the running of the business," and that Smith used some of those blank checks to convert funds from Lyle's bank account to her personal use. *Id.* ¶¶ 8-11.  Smith, however, contends that the purpose of the blank checks was for her to "pay [Lyle's] invoices and bills" and that she spent no more than thirty minutes per week doing so.  Smith Decl. ¶ 17.  It is therefore uncertain whether and to what extent Smith's authority to use Lyle's pre-signed checks was related to the management or general operations of his business and whether that task was part of Smith's primary duty.

More fundamentally, Smith disputes Lyle's claim that her primary role related to the management or general operations of his business at all.  In reality, Smith contends, she did not perform many of the tasks listed in her offer letter and job description, *id.* ¶ 11, and Lyle provides little by way of pushback to that contention beyond reiterating his vague assertion that Smith "performed the duties that are set forth in the job description for her position as executive assistant," Lyle Reply Decl. ¶ 3.  Indeed, Lyle does not provide any examples of tasks that Smith completed that fall into any of the nonexhaustive categories listed in 29 C.F.R. § 541.201(b), or are comparable to those types of activities.

Instead, Smith asserts that her role was more in the nature of a personal assistant, and that her primary duties included tasks like house sitting, taking of care of Lyle's children, paying his bills, adding meetings to his calendar, arranging for maintenance on his house, and making dinner and travel reservations.  Smith Decl. ¶ 8.  In response, Lyle contends that he "engaged other individuals" to walk his dogs and take care of his children, but stops short of denying that Smith also performed these functions.  Lyle Reply Decl. ¶ 4.

On this record, a reasonable jury could decline to find that Smith's primary duty related to the management or general operations of Lyle and Fulmar's business.  Accordingly, the Court concludes that there are genuine disputes of material fact relevant to that issue.

## 2. Exercise of Discretion and Independent Judgment With Respect to Matters of Significance

For largely similar reasons, the Court cannot conclude as a matter of law that Smith's role "include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a).  The Second Circuit has explained that this requirement "is manifested by the authority to formulate, affect, interpret, or implement the employer's management policies or its operating practices, by involvement in planning the employer's long-term or short-term business objectives, or by the carrying out of major assignments or committing major financial resources in the conduct of the employer's business."  *Pippins*, 759 F.3d at 240-41 (cleaned up).  That formulation echoes the Department of Labor's implementing regulations, which focus on whether "the employee has authority to make an independent choice, free from immediate direction or supervision."  29 C.F.R. § 541.202(c).

The evidence that Lyle and Fulmar rely on falls well short of demonstrating that Smith satisfies the discretion-and-judgment requirement as a matter of law.

The declaration that Lyle and Fulmar principally rely on contains no examples of Smith formulating, interpreting, or implementing any management policies or operating practices.  Nor does it contain any information about whether Smith took part in planning Lyle and Fulmar's long-term or short-term business objectives.  And the only example of a potential "major assignment[]" that Lyle and Fulmar point to is that Smith helped to implement a "new IT system."  Lyle Decl. ¶ 6.  But Lyle and Fulmar provide no details regarding Smith's use of discretion or independent judgment in assisting with that project, nor any information regarding the project's significance to their business.  And according to Smith, she merely "researched the options" and presented Lyle with price quotes from various IT firms.  Smith Decl. ¶ 15.  Although Smith's selection and presentation of options for an IT company may have involved the sort of discretion and independent judgment contemplated by the FLSA, there is little evidence indicating whether this task was significant to Lyle and Fulmar's business or emblematic of Smith's primary duty.

Lyle and Fulmar's reliance on Smith's authority to use Lyle's pre-signed checks to "make the payments necessary for the running of the business," Lyle Decl. ¶ 8, is similarly insufficient. Lyle and Fulmar provide little to no factual elaboration regarding what, if any, discretion or independent judgment Smith exercised in carrying out that responsibility or how significant Smith's role was in that regard.  *See* Lyle Reply Decl. ¶ 6 (suggesting that Smith's role in writing checks included "interacting with the vendor or organization about the items in the invoice or services performed" but providing no explanation of what those interactions entailed).  For instance, it is unclear from Lyle's vague declaration whether Smith's authority to fill out the pre-signed checks involved discretion with respect to which amounts to pay and which payments to prioritize, as opposed to simply making sure that all of Lyle's bills and invoices got paid as stated.  *See* Smith Decl. ¶ 17 ("Lyle left signed checks and told me to pay his invoices and bills with the

checks . . . ."). Lyle and Fulmar also provide no evidence concerning the importance of Smith's task in this regard or whether it was her primary duty, beyond the vague assertion that the checks were for payments "necessary for the running of the business." Lyle Decl. ¶ 8. And to the extent that Smith's declaration sheds any light on whether writing checks was part of her primary duty, it suggests that task was at most a minor part of her job, consuming no more than thirty minutes per week. Smith Decl. ¶ 17.

Nor would the fact that Smith apparently "believed that she had the authority, discretion and judgment to issue" checks to herself for $21,500, Defts.' Reply at 3-4, compel a jury to find that Smith's primary duties involved the exercise of discretion and independent judgment with respect to Lyle and Fulmar's financial affairs. That is so because, as noted, the current record contains very little evidence regarding the nature and scope of Smith's authority to fill out Lyle's pre-signed checks and whether she properly exercised discretion and independent judgment in determining the nature and amount of those payments. Indeed, Lyle's bank flagged the checks that Smith made out to herself as "suspicious" precisely *because* Smith "did not normally receive funds" from Lyle's account, Sigda Decl., Exh. 5, and Smith asserts that she was "terminated immediately upon being confronted about the checks" and was "immediately locked out of [Lyle's] apartment and computer system" without the opportunity to provide receipts for the expenses she claims to have advanced, Smith Decl. ¶ 16. Based on these facts, a reasonable jury could decline to infer from Smith's act of writing three checks to herself from Lyle's personal account that her primary duty properly involved the exercise of discretion and independent judgment regarding Lyle and Fulmar's financial affairs.

The case law that Lyle and Fulmar rely on only makes clearer why the record in this case falls short of supporting an application of the administrative exemption as a matter of law.

In *Dineley v. Coach*, for example, the court concluded that the administrative exemption applied as a matter of law where the employee "trained new assistants and 'on-boarded' them when they joined [the company]," had "primary responsibility for supervising and delegating work to two administrative assistants," "interviewed applicants for administrative and executive assistant positions," and "made recommendations on who should be hired."  No. 16 Civ. 3197 (DLC), 2017 WL 2963499, at *6 (S.D.N.Y. July 11, 2017).  Here, by contrast, Lyle and Fulmar have provided no evidence regarding what, if any, supervisory authority Smith had at the company or whether she exercised any discretion with respect to core operational matters like hiring and firing decisions.  *See* 29 C.F.R. § 541.201(b) (citing "personnel management" and "human resources" as examples of work that is directly related to management or general business operation); *id.* § 541.202(b) (citing the implementation of "management policies or operating practices" as indicative of the exercise of discretion and independent judgment).

Along the same lines, the court in *Seltzer* held that an employee was administratively exempt based on evidence that the employee, among other things, exercised discretion in screening a corporate executive's communications, exercised influence in recommending that a temporary employee be hired permanently, completed expense reports, and testified that her job encompassed "anything that most executives of [the level of president and managing director] require from an assistant."  356 F. Supp. 2d at 292-93, 301-02.  In this case, however, there is no evidence that Smith exercised discretion in screening Lyle's communications, exercised influence in Fulmar's operational decisionmaking, or completed any expense reports.  Indeed, Smith flatly denies ever fulfilling these functions.  Smith Decl. ¶¶ 11-15.  And far from admitting that her role included everything that a high-level executive would need from an assistant, Smith contends that her role primarily involved personal tasks like house sitting and taking care of Lyle's children, and

secretarial tasks like organizing Lyle's email, paying his bills, and adding meetings to his calendar. *Id.* ¶ 8. While Smith does state that she exercised a degree of discretion in helping Lyle with dinner and travel reservations, and with finding a company to move art works between his apartment and house, *id.* ¶¶ 5, 8, the record is vague as to whether and to what extent these activities were matters of significance or related to Lyle and Fulmar's business.

The decisions of the Fourth Circuit and the District of Maryland that Lyle and Fulmar rely on provide a similarly unfavorable contrast to the evidence they presented in this case. In *Altemus v. Federal Realty Investment Trust*, the Fourth Circuit affirmed the district court's application of the administrative exemption based on, among other things, evidence that the employee exercised a "high level of independence and discretion" in drafting performance reviews and received a significantly higher salary than the company's non-exempt administrative assistants. 490 F. App'x 532, 537 (4th Cir. 2012) (unpublished). And in *Lane v. Systems Application & Technologies, Inc.*, the district court applied the administrative exemption based in part on evidence that the employee screened calls for the company's president, prepared and submitted expense reports, drafted documents for the president's approval, and served as a supervisor of record to at least three other employees, which involved approving requests for leave, advising them about company policy, and assigning them work. No. 13 Civ. 3566 (DKC), 2015 WL 1013449, at *8-9 (D. Md. Mar. 6, 2015).

The cases that Lyle and Fulmar cite in support of their reliance on Smith's authority to fill out Lyle's pre-signed checks do not do much to move the needle either. In *Smith v. Government Employees Insurance Co.*, for instance, the D.C. Circuit held that the administrative exemption applied to insurance adjusters who, while acting "free from immediate direction or supervision," had the authority to negotiate with claimants and settle claims worth as much as $15,000 on behalf

of the insurer.  590 F.3d 886, 895 (D.C. Cir. 2010).  And in *Scarpinato v. East Hampton Point Management Corp.*, the employee, in addition to writing checks "as sole signatory," also signed other legal and financial documents on behalf of a restaurant (including credit applications and tax documents), selected items for the restaurant's menu, produced budgets and financial reports, and participated in hiring and firing decisions.  No. 12 Civ. 3681 (JFB), 2013 WL 5202656, at *6, *11 (E.D.N.Y. Sept. 13, 2013).  Similarly, the employee in *Krumholz v. Village of Northport* supervised the drafting of a village's budget, decided how to invest the village's excess funds, and had the authority to open bank accounts and sign checks.  873 F. Supp. 2d 481, 489 (E.D.N.Y. 2012).  To summarize these cases is virtually to refute Lyle and Fulmar's reliance on the meager factual record in this case concerning Smith's authority to fill out pre-signed checks, *see* Defts.' Reply at 3-4—an activity that Smith contends took up thirty minutes or less of her time per week and was for purposes of paying Lyle's bills and invoices, Smith Decl. ¶ 17.

Accordingly, the Court concludes that there are genuine disputes of material fact concerning the issue of whether Smith's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

* * *

For these reasons, the Court cannot conclude as a matter of law that Smith's employment with Lyle and Fulmar fell within the FLSA's and the NYLL's administrative exemption.  As discussed, that conclusion is largely a reflection of the vague and disputed nature of the evidence concerning whether and to what extent Smith's primary duty related to the management or general operations of Lyle and Fulmar's business, and whether her primary duty included the exercise of discretion and independent judgment concerning matters of significance.  Lyle and Fulmar's motion for summary judgment on Counts I and II of the Amended Complaint is therefore denied.

### III.  Lyle and Fulmar's Motion to Dismiss

Lyle and Fulmar simultaneously move to dismiss Count VI of the Amended Complaint for failure to state a claim under Rule 12(b)(6).  Defts.' Motion at 18-23.  Count VI alleges that Lyle and Fulmar unlawfully deducted amounts from Smith's wages in connection with her alleged receipt of a salary advance.  Am. Compl. ¶¶ 70-73.  In support of their motion to dismiss, Lyle and Fulmar argue that Smith cannot plausibly allege that any compensation was withheld from her because she was paid in full for the periods that she worked in 2023 by virtue of the salary advance. *See* Defts.' Motion at 21-22.  For the following reasons, Lyle and Fulmar's motion to dismiss Count VI is denied.

### A.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In other words, the Rule 12(b)(6) plausibility standard requires factual allegations sufficient to "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged." *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

### B.    Statutory and Regulatory Framework

Section 193 of the NYLL provides that, with certain exceptions, "[n]o employer shall make any deduction from the wages of an employee."  N.Y. Lab. Law § 193(1).  One of the exceptions to that rule allows an employer to deduct amounts from an employee's wages for the "repayment of advances of salary or wages made by the employer to the employee." *Id.* § 193(1)(d).  Any

deductions to cover such repayments, however, "shall be made in accordance with regulations promulgated by the commissioner for this purpose." *Id.*

The applicable regulations define an "advance" as "the provision of money by the employer to the employee based on the anticipation of the earning of future wages." 12 N.Y.C.R.R. § 195-5.2. For a deduction of wages for purposes of repayment of an advance to be proper, "[t]he employer and employee must agree to the timing and duration of the repayment deduction in writing before the advance is given." *Id.* § 195-5.2(a). In addition, "[p]rior to the advance being given to the employee[,] the employee shall give written authorization for the deduction(s) to be made to repay the advance." *Id.* § 195-5.2(e). That written authorization "shall contain the amount to be advanced, the amount to be deducted to repay the advance in total and per wage payment and the date(s) when each such deduction shall be taken." *Id.* The authorization must also "include notice to the employee that he or she may contest any deduction that is not in accordance with the terms of the written advance authorization." *Id.* Further, the employer "shall implement a procedure by which the employee, after receiving the advance, may dispute the amount and frequency of deductions that are not in accordance with the terms of the written advance authorization." *Id.* § 195-5.2(f). The regulations provide that "[t]he failure of an employer to afford this process to the employee will create the presumption that the contested deduction was impermissible," *id.* § 195-5.2(h), and declare that "[a]ny provision of money by the employer to the employee that does not comply with Section 193 of the Labor Law and [the applicable regulations] shall not be considered an 'advance' and may not be reclaimed through wage deductions," *id.* § 195-5.2(i).

## C.    Analysis

Smith alleges that Lyle and Fulmar provided funds to her that did not satisfy the statutory and regulatory procedure for salary advances and that Lyle and Fulmar unlawfully deducted a

portion of those funds from her wages.  According to the Amended Complaint, Lyle and Fulmar paid Smith $24,791.69 on January 19, 2023 and $28,333.36 on April 11, 2023 in anticipation of Smith working fifteen biweekly pay periods.  Am. Compl. ¶ 26.  Lyle and Fulmar, however, allegedly failed to agree in writing to the timing and duration of Smith's repayment obligations prior to giving her the advance.  *Id.* ¶ 32; *see* 12 N.Y.C.R.R. § 195-5.2(a).  In addition, Lyle and Fulmar allegedly failed to obtain written authorization from Smith to deduct the amount of the advance from her wages.  Am. Compl. ¶ 34; *see* 12 N.Y.C.R.R. § 195-5.2(e).  And finally, Lyle and Fulmar allegedly failed to implement a procedure to allow Smith to dispute the amount and frequency of the deductions from her wages.  Am. Compl. ¶ 36; *see* 12 N.Y.C.R.R. § 195-5.2(f).  Smith alleges that Lyle and Fulmar's deduction of approximately $42,994.09 from her wages in 2023 to repay the purported advance was therefore unlawful.  Am. Compl. ¶¶ 27, 37-38, 73.

In moving to dismiss Count VI, Lyle and Fulmar rely on the once-settled principle that a wholesale unauthorized failure to pay wages does not constitute a deduction within the meaning of the NYLL.  *See, e.g.*, *Goldberg v. Jacquet*, 667 F. App'x 313, 314 (2d Cir. 2016) (summary order) ("In order to state a claim for a violation of NYLL § 193, a plaintiff must allege a specific deduction from wages and not merely a failure to pay wages." (citing *Kletter v. Fleming*, 820 N.Y.S.2d 348, 350 (3d Dep't 2006))); *Gold v. Am. Med. Alert Corp.*, No. 14 Civ. 5485 (JFK), 2015 WL 4887525, at *5 (S.D.N.Y. Aug. 17, 2015).  In 2021, however, the state legislature amended Section 193 to make clear that "[t]here is no exception to liability under this section for the unauthorized failure to pay wages, benefits or wage supplements."  N.Y. Lab. Law § 193(5); *see Frost v. Lentex Co.*, No. 20 Civ. 5313 (VB), 2022 WL 17968058, at *10 (S.D.N.Y. Dec. 27, 2022).  So to the extent that Lyle and Fulmar seek dismissal of Count VI based on the principle that a complete failure to pay wages does not constitute a deduction under Section 193, that argument

fails.  *See Birner v. Kensington Vanguard Holdings, LLC*, No. 24 Civ. 2743 (LTS), 2025 WL 963311, at *6 (S.D.N.Y. Mar. 31, 2025) (holding that the defendant's "argument that the 'wholesale withholding' of [wages] does not fall within the meaning of 'deduction' under Section 193 must fail in light of the . . . clarification that Section 193 encompasses claims against employers for *any* unpaid 'wages,' as defined in Section 190").

More fundamentally, Lyle and Fulmar argue that the Amended Complaint has not alleged a deduction of wages because, in fact, Smith was overpaid; that is, she received a purported advance representing fifteen biweekly pay periods, but was fired prior to the end of that period. Defts.' Motion at 21-23; Defts.' Reply at 9-11.  Because those funds were given to Smith in contemplation of fifteen biweekly pay periods of employment, Lyle and Fulmar contend that "there were no weeks for which [Smith] worked and was not paid in full" and that "[t]here were never any wage deductions."  Defts.' Reply at 9-11.

In arguing that Smith's receipt of the purported advance indicates that her wages for the pay periods corresponding to that amount could not have been deducted, however, Lyle and Fulmar misunderstand the effect of Section 193 and its implementing regulations.  Section 193 provides that an employer may not deduct amounts from an employee's wages (including, post-2021, failing to pay the employee's wages without authority to do so) for the purpose of offsetting a purported salary advance unless the purported advance complied with the statute's implementing regulations.  N.Y. Lab. Law § 193(1)(d), (5).  Section 193's implementing regulations, in turn, establish a framework through which employers may provide salary advances subject to several requirements.  *See* 12 N.Y.C.R.R. § 195-5.2; *see supra* III.B.  And those regulations make clear that a payment by an employer to an employee—even if otherwise given to the employee "based on the anticipation of the earning of future wages"—"shall not be considered an 'advance' and

may not be reclaimed through wage deductions" if the payment fails to comply with all the applicable regulatory requirements.  12 N.Y.C.R.R. § 195-5.2(i).

Section 193 and its implementing regulations therefore contemplate the precise situation that Lyle and Fulmar suggest is "absurd."  Defts.' Reply at 10.  That is, where an employer provides funds to an employee purportedly in anticipation of wages to be earned in future pay periods, fails to comply in some respect with the regulatory requirements for salary advances, and then, in light of the earlier payment, withholds in whole or in part the wages that the employee otherwise would have received in the relevant future pay periods, the employer thereby violates Section 193.  In other words, the framework established by Section 193 and its implementing regulations contemplates that an employee who receives a putative advance still remains generally entitled to their regular wages following the advance, subject to the employer's right to make appropriate deductions from the employee's wages (up to the full amount of each wage payment) for the repayment of the advance.  Those deductions, however, must be made in accordance with the procedures and requirements established by the regulations.

Smith's allegations fit comfortably with this paradigm.  She alleges that Lyle and Fulmar provided her with a sum of money purportedly in anticipation of the wages she would earn in future pay periods, that the payment failed to comply with the requirements for a salary advance in various respects, and that Lyle and Fulmar deducted a portion of the value of the purported advance from her wages, which they were not allowed to do because the earlier payment failed to comply with the regulatory requirements applicable to salary advances.  Am Compl. ¶¶ 26-38, 70-73.  Contrary to Lyle and Fulmar's unsupported assertion that Smith was, by virtue of the purported advance, properly compensated at all times, those allegations are sufficient to sketch a plausible claim for unlawful deductions in violation of the NYLL at this stage.  Indeed, if it were otherwise,

it would be difficult to see how employees could ever sustain a claim for unlawful deductions where the deductions were made in repayment of a purported salary advance, because the employers would in every instance argue (just like Lyle and Fulmar do) that the fact of the purported advance itself shows that the employee suffered no reduction in wages. Lyle and Fulmar cite no authority supporting that unlikely interpretation of Section 193 and its implementing regulations.

The Court therefore denies Lyle and Fulmar's motion to dismiss Count VI.

### IV. Smith's Motion to Dismiss

Smith moves to dismiss Lyle and Fulmar's third counterclaim, which asserts a cause of action for money had and received. Pl.'s Motion at 1. For the following reasons, this motion to dismiss is denied as well.

### A.    Legal Standard

A motion to dismiss a counterclaim under Rule 12(b)(6) is governed by the same standard as a motion to dismiss an initial complaint. *We the Protesters, Inc. v. Sinyangwe*, 724 F. Supp. 3d 281, 289 (S.D.N.Y. 2024). To survive a motion to dismiss under Rule 12(b)(6), a counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A counterclaim is plausible "when the [counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the [counterdefendant] is liable for the misconduct alleged." *Id.* In other words, the Rule 12(b)(6) plausibility standard requires factual allegations sufficient to "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged." *Citizens United*, 882 F.3d at 380 (quoting *Twombly*, 550 U.S. at 556).

**B.      Analysis**

To state a claim for money had and received under New York law, the plaintiff must allege

that: "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefitted

from receipt of the money, and (3) under principles of equity and good conscience, the defendant

should not be permitted to keep the money." *Goel v. Ramachandran*, 975 N.Y.S.2d 428, 436 (2d

Dep't 2013).  Such a cause of action "depends upon equitable principles in the sense that broad

considerations of right, justice and morality apply to it." *Parsa v. State*, 474 N.E.2d 235, 237

(N.Y. 1984).  Here, Lyle and Fulmar's counterclaim for money had and received seeks $11,130.96

in damages, representing the amount by which Smith was allegedly overpaid as a result of her

employment ending prior to the end of the fifteen biweekly pay periods for which she received a

purported salary advance.  Counterclaims ¶¶ 22-25.

Smith argues that because the purported advance giving rise to the alleged overpayment

did not comply with the statutory and regulatory requirements applicable to salary advances, Lyle

and Fulmar cannot recover the excess amount paid as a matter of equity.  Pl.'s Motion at 2.  But

the factual allegations supporting Lyle and Fulmar's supposed noncompliance with the legal

requirements for salary advances are found only in Smith's own Amended Complaint—not in Lyle

and Fulmar's Counterclaims—and Smith cites no authority holding that a plaintiff must

affirmatively allege compliance with the statutory and regulatory requirements for a salary

advance in order to state a plausible claim for money had and received in that context.  Indeed,

imposing such a pleading requirement would make little sense given that the statutory and

regulatory provisions that Smith relies on impose protections against *wage deductions*, not

limitations on employers' rights to seek a monetary recovery from their employees through ways

other than wage deductions.  *See* N.Y. Lab. Law § 193; 12 N.Y.C.R.R. § 195-5.2.

More fundamentally, a plaintiff's burden in pleading the merits of her case is generally limited to plausibly alleging facts that establish the "essential elements" of her cause of action—*i.e.*, what the plaintiff would be required to prove in order to win at trial. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020); *see* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). And by alleging that Smith received and failed to return $11,130.96 in wages for which she performed no work, Lyle and Fulmar have done just that. To be sure, the Court does not necessarily rule out that attendant violations of the NYLL and its implementing regulations, if they occurred, might prove relevant to the equitable analysis called for by Lyle and Fulmar's counterclaim for money had and received. But any potential inequity stemming from such violations does not appear on the face of Lyle and Fulmar's Counterclaims, and the Counterclaims' failure to preempt such a defense does not preclude a "reasonable expectation" that discovery will turn up evidence supporting their claim for money had and received. *Twombly*, 550 U.S. at 556; *cf. Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) ("The test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.").

Smith's attempt to analogize Lyle and Fulmar's counterclaim for money had and received to an attempt to "enforce an illegal contract" is equally unavailing. Pl.'s Motion at 4. Setting aside that Lyle and Fulmar's pleading does not itself supply any factual support for Smith's argument that the purported advance was illegal, the provisions of the NYLL and its implementing regulations that Smith relies on do not reach that far. Although the applicable regulations prevent an employer from using wage deductions to recoup the amount of a putative advance unless the advance complied with the applicable regulatory requirements, the provisions that Smith relies on do not declare a noncompliant advance unlawful in and of itself or, as noted, prohibit an employer

from seeking its repayment in ways that do not involve wage deductions.  *See* 12 N.Y.C.R.R. § 195-5.2.  And the Counterclaims allege that the $11,130.96 figure sought to be recovered represents wages that Smith did *not* earn, Counterclaims ¶ 24, and therefore that amount, as alleged, was not unlawfully deducted from her wages.

Accordingly, the Court denies Smith's motion to dismiss.

### V.  Conclusion

For these reasons, the Court denies each of the parties' pending motions.  The Clerk of Court is respectfully directed to close Docket Numbers 26 and 35.

SO ORDERED.

Dated:  June 16, 2025
         New York, New York

_____
JOHN P. CRONAN
United States District Judge